# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

TIM HAMBORSKY,                              )
                                            )   No. 2:12-cv-428 TFM
    Plaintiff,                          )   Electronic filing
                                            )
    v.                                  )   JURY TRIAL DEMANDED
                                            )
THOMAS O' BARTO,                            )
and LARRY MEDLOCK,                          )
                                            )
    Defendants.                         )   TYPE OF PLEADING:
                                            )
                                            )   AMENDED COMPLAINT
                                            )
                                            )   Attorney of record for
                                            )   Plaintiff:
                                            )
                                            )   MOORE, BECKER,
                                            )     SMARTO & CISZEK, P.C.
                                            )
                                            )   JOHN P. SMARTO, ESQ.
                                            )
                                            )   john@moorebecker.com
                                            )
                                            )   John P. Smarto
                                            )   Pa. I.D. 58293
                                            )   121 West Second Street
                                            )   Greensburg, PA 15601
                                            )   724-838-8422
                                            )   724-838-0291-fax

# COMPLAINT

Plaintiff, **TIM HAMBORSKY** by and through his attorneys, **MOORE, BECKER, SMARTO & CISZECK, P.C.** and **JOHN P. SMARTO, ESQ.**, alleges as follows:

## I.   PRELIMINARY STATEMENT

1.      This is an action for civil redress relative to constitutional violations perpetrated by the Defendants.

## II.   NATURE OF THE ACTION

2.      This is an action for monetary damages and other appropriate relief.

## III.   JURISDICTION AND VENUE

3.      This action arises under the Fourth and Fourteenth Amendments to the Constitution of the United States of America, and under the laws of the United States of America, specifically,  42 U.S.C. §1983 to redress, under color of State law, the deprivation of rights secured by the United States Constitution. This court has jurisdiction in this case pursuant to 28 U.S.C. §§1331 and 1343.  The District Court has supplemental jurisdiction over the state law claims pursuant to 28 USC §1367. Venue is proper in this District under 28 U.S.C. §1391(b), because the Defendants' unlawful acts and omissions giving rise to these claims occurred in this District.

## IV.   PARTIES

### A.    The Plaintiff

4.     Tim Hamborsky is a former Correctional Officer at the Fayette County Prison and worked in the capacity for twenty two (22) years.

### B.    The Defendants

5.     Thomas O'Barto was, at all times relevant hereto, a detective with the Washington Township Police department and an undercover detective with the Fayette County Drug task force.  He executed the affidavit of probable cause detailing his meetings with inmate, Aaron Spade.  O'Barto, upon information and belief, is, and has been, a citizen of the Commonwealth of Pennsylvania.

6.     Larry Medlock, was, at all times relevant hereto, the Warden of Fayette County Prison. He directly participated in the 'Buy Bust' set up of Tim Hamborsky, arranged and participated in meetings between inmate Aaron Spade and Defendant O'Barto, and was present on November 5, 2008 at the arrest of Tim Hamborsky. Upon information and belief, is, and has been, a citizen of the Commonwealth of Pennsylvania.

7.     The defendants are being sued in their individual capacities.

8.      Medlock actively participated in setting up the Plaintiff.

9.     Medlock directly participated in the sting operation and apprehension of the Plaintiff on November 5, 2008.

# FACTUAL ALLEGATIONS

10.    Plaintiff incorporates by reference paragraphs 1 through 9 as though the same were here fully set forth at length.

11.    On November 5, 2008, Plaintiff was employed by Fayette County as a Correctional Officer at the Fayette County Prison in Uniontown, Pennsylvania. He had been in the County's employment in that capacity for twenty two (22) years.

12.    During the course of his time as a Correctional Officer, he had come to know an inmate, Aaron Spade, who has served jail time in the Fayette County Prison periodically since 1988.  Spade was usually in the Intermediate Work Unit, where he performed labor for the prison and developed relationships with many Correctional Officers, as well as both the Warden and the Deputy Warden.  Spade considered Hamborsky a friend.

13.    Spade has been convicted of various criminal offenses, including homicide.  In August of 2008, Spade was incarcerated in Fayette County, having been transferred from the State Correctional Institution at Graterford, Pennsylvania, where he was serving time for a probation violation.

14.    When Spade was transferred to Fayette County Prison, he had pending charges involving retail theft and, given that he is a repeat felon, he was to expect a long prison term on those charges.

15.    Sometime in October of 2008, Spade allegedly made a written request to speak to the Warden, defendant Larry Medlock.

16.     Medlock agreed to meet with Spade sometime in the month of October of 2008.

17.     The reason for Spade's request to meet with Medlock was his determination to gain lenient treatment from the District Attorney on his pending criminal charges.

18.     At the first meeting between Medlock and Spade, Spade stated his interest in receiving lenient treatment on his pending charges including possible dismissal or a reduced sentence if convicted. Medlock asked him what he could do in exchange for what he was requesting.

19.     Spade told Medlock that he "could get Hamborsky to bring in tobacco, drugs or whatever".

20.     In the past, Hamborsky would give snuff to Spade when he was doing his work for the prison.  He was given permission to give Spade snuff by Warden Larry Medlock.

21.     In fact, Medlock, Deputy Warden Brian Miller, and other Correctional Officers not only knew about Spade receiving snuff, they also provided Spade with snuff tobacco themselves.

22.     Tobacco was permitted to be brought into the prison for personal use by Correctional Officers and other employees. There are designated areas in the Fayette County Prison where tobacco use is appropriate.  It was not unusual for Spade, who used snuff, to be given such tobacco by Hamborsky, Medlock and others.

23.     At the initial meeting with Medlock, Spade told Medlock that Hamborsky had brought him snuff in the past and that he could set up Hamborsky,

unaware that Medlock had authorized Hamborsky to do so. Medlock then contacted Detective Thomas O'Barto, and told him Spade was willing to have Hamborsky bring drugs into the prison. Medlock also provided a photograph of Hamborsky to O'Barto.

24. On October 29, 2008, another meeting was arranged with Erin Spade by Defendant Medlock. At that meeting, Spade was introduced to Detective Thomas O'Barto, a Washington Township Police Detective, as well as an undercover Detective for the Fayette County Drug Task Force. Medlock had contacted O'Barto about his first conversation with Spade.

25. October 29, 2008 was the first of three (3) meetings involving O'Barto, Spade and Medlock. At the first meeting, Spade told O'Barto that he could set up Hamborsky because he had given him snuff tobacco in the past.

26. At the October 29, 2008 meeting, Spade never told Medlock or O'Barto that Hamborsky brought him drugs of any kind in the past, only snuff.

27. In fact, Spade testified at both Hamborsky's preliminary hearing and at trial that Hamborsky had never brought him drugs, only snuff.

28. Indeed, O'Barto, in his 'Initial case investigation report' dated November 5, 2008, described the October 29, 2008 meeting with Spade as follows: "10-29-08, this affiant was requested to meet with Warden Medlock of the Fayette County Prison in reference to a prison guard, namely, Tim Hamborsky. Medlock had received information that Hambrosky was smuggling in tobacco and *occasionally drugs* into the prison…"

29. At the October 29, 2008 meeting according to O'Barto's Report he further describes the conversation: *"Spade stated he would set up Hamborsky if he would*

*get consideration on a criminal charge pending on him. Spade stated that he could meet*

*Hamborsky and set up a delivery. I advised Spade to have Hamborsky deliver some*

*tobacco and some narcotic pills into the prison, for which he would get 75 dollars. "*

30.     At the conclusion of the meeting of October 29, 2008, O'Barto, in

his Report, stated: *"I asked Spade if Hamborsky ever brought drugs into the prison and*

*he stated, yes. "* As aforesaid, Spade testified in court on two occasions that Hambrosky

never brought him drugs and that he never asked him to do so.

31.     Medlock and O'Barto both knew Hamborsky had provided snuff to

Spade in the past. Medlock was aware that Spade was given tobacco by him personally,

his deputy, and other Correctional Officers. To set up Hamborsky, both Medlock and

O'Barto knew that drugs had to be part of the arrangement.  O'Barto's Report formed the

entire basis for the set up, the arrest and prosecution on three (3) drug charges.

32.     No defendant named  in this Complaint ever suspected the Plaintiff

of bringing drugs into the prison, in particular Larry Medlock and Thomas O'Barto.

33.     Plaintiff alleges that with the aid of Medlock, the Report signed by

O'Barto was falsified in order to manufacture a criminal case against Hamborsky for

which there was no probable cause.

34.     After the October 29, 2008 meeting, Spade did in fact approach

Hamborsky about bringing him some snuff. He never mentioned narcotic pills because he

knew Hamborsky would never bring him drugs of any kind.

35.     Hamborsky offered to give him some snuff when he was working

at an area of the prison where tobacco was allowed, and where Spade had used snuff in

plain view in the past without any problems from the Warden, Deputy Warden, or other correctional officers.

36.     On November 3, 2008, O'Barto met again with Medlock and Spade.  Spade said "everything was good".  O'Barto then advised Spade where the bag containing the tobacco, money and pills would be planted.  During this period of time, O'Barto brought falsified information to then District Attorney Nancy Vernon indicating that he had probable cause to suspect that Hamborsky was smuggling narcotics into the Fayette County Prison.  This, in spite of the fact the O'Barto had no prior relationship with Spade's veracity as an informant. Vernon gave her consent to a sting operation to be carried out by the Fayette County Drug Task force.

37.     Spade told Hamborsky that his girlfriend would put some snuff in a bag outside of the prison and not to worry about purchasing the snuff for him.  Spade offered Hamborsky money, which he refused.

38.     On November 4, 2008, O'Barto met with Spade and Medlock again.  Spade "confirmed that everything was on", according to O'Barto's Affidavit. Hamborsky was to be set up the following evening at approximately 11:30 p.m.

39.     Sometime before November 5, 2008, O'Barto contacted Defendants Reese, Haggarty, Kozlowski, Howard and Harvey to arrange the logistics of setting up Hamborsky at the Fayette County Prison and the role each would play in the operation.

40.     On November 5, 2008, O'Barto states in his Affidavit: "this Affiant along with Det. Reese, Harvey, Howard, and Koslosky(sic), and Lt. Haggarty,

assisted by Warden Medlock, set up a sting operation outside of the Fayette County Prison entrance."

      41.    Video equipment was set in the District Attorney's office. Surveillance was conducted by Kozlowski and Haggarty.

      42.    O'Barto packaged the tobacco, money and narcotic pills in a small plastic sandwich bag, concealing the pills, which were wrapped in a small 'baggie', and bundled together with Bugler tobacco and Seventy Five ($75.00) dollars in cash, in denominations of  three (3) Twenty ($20.00) dollar bills, two (2) Five ($5.00) dollars bills, and, five (5) One ($1.00) dollar bills. The tobacco, money and pills were then placed in a plastic Dollar General bag, which was then placed by O'Barto beneath a newspaper vending machine near the prison entrance.

      43.    On November 5, 2008, at 11:30 p.m., Hamborsky arrived at the Fayette Count Prison for work.  He went to the newspaper vending machine and picked up the plastic 'Dollar General' bag.

      44.    He pressed a buzzer to get inside the prison, was let in, and within seconds of entering, Hamborsky was immediately apprehended in the stairwell by O'Barto, Medlock and Reese and placed under arrest.  Once in custody, he was led across the street to the Office of the District Attorney.

      45.    O'Barto verbally read him his Miranda rights and Hamborsky stated he did not understand his rights.  Reese, then re-Mirandized him verbally to which Hamborsky, visibly shaken, again stated he did not understand his rights.

46.     Hamborsky was then given his Miranda rights in written form, which he then stated he understood. The plastic bag was taken from him and O'Barto opened it, showing Hamborsky the contents.

47.     Hamborsky, still emotionally overcome and shaken, was subjected to intense questioning and denied that he ever brought drugs into the prison and never agreed to bring pills to Erin Spade.

48.     As he continued to deny the allegations made against him regarding his alleged agreement with Spade to bring in drugs, Nancy Vernon confronted him, stating: "We know you are lying; I will take your pension."

49.     Hamborsky was then taken to District Magistrate Abram sometime after midnight on November 6, 2008, for a preliminary arraignment.

50.     Bail was set at Twenty Five Thousand ($25,000.00) Dollars, unsecured.  Hamborsky was advised with regard to his conditions of bail and the obligations under the bail agreement.

51.     Hamborsky, still under great emotional stress, was forced to make a written statement while at the District Magistrate.

52.     He admitted to picking of the plastic bag and bringing in tobacco for money, but denied ever bringing in drugs. He stated he thought he was bringing in tobacco, but not drugs. He said he knew Spade for a long time and was just helping him out.

53.     O'Barto charged Hamborsky with two violations of the Drug Act: Possession of a Controlled Substance-Vicodin, with Intent to Deliver (35§780-113, §§A 30) and Possession of a Controlled Substance; (35§780-113§§ A 16).  O'Barto also

charged him with Contraband/ Controlled Substance/Vicodin. (18 §5123§§A).

Hamborsky was not charged with anything related to bringing in tobacco.  The two (2)

felony charges and one (1) misdemeanor all relate to the Vicodin that O'Barto placed in

the plastic bags. O'Barto signed the criminal complaint and executed an Affidavit of

Probable Cause, which is abbreviated compared to his Report which formed the basis of

the entire operation against the Plaintiff.

   54. The following day, November 7, 2008, Medlock gave Hamborsky

a letter suspending him "indefinitely without pay for acts committed by you on

November 5, 2008 at 11:30 p.m., which has resulted in Criminal Charges being filed."

   55. On November 16, 2008, Medlock attended a meeting of the

Fayette County Prison Board, of which former District Attorney Vernon was a member.

   56. In that meeting, Vernon adamantly argued that Hamborsky be

summarily terminated from his job as a Correctional Officer without regard to his

Procedural Due Process rights as a public employee protected by a collective bargaining

agreement.

   57. The Board announced that Hamborsky was terminated from

employment with the Fayette County, less than a week after his arrest.

   58. The District Attorney then took to the media to give a statement.

She explained to the Pittsburgh Tribune Review that she and officers from the task force

videotaped Hamborsky from her office widow as he retrieved the narcotics from a hiding

place under newspaper vending machines. The machines are located directly under

Vernon's window in the courthouse.

59.     Nancy Vernon indicated to the press that any plea bargain must involve jail time.

60.     Hamborsky, after twenty-two years of service to Fayette County, was publically humiliated in the media and branded a criminal.

61.     Hamborsky appeared for a Preliminary Hearing before District Magistrate Michael Rubish on January 13, 2009.

62.     Nancy Vernon conducted the hearing on behalf of the Commonwealth and called Erin Spade and Thomas O'Barto as witnesses.

63.     Spade testified that he was willing to use his good relationship with Hamborsky, developed over twenty years, in order to receive leniency on his retail theft charge, then pending in Fayette County.

64.     Spade testified as to the meetings between O'Barto and Medlock about setting up Hamborsky in exchange for preferential treatment by the District Attorney on his pending charges, which potentially carried a lengthy prison term if convicted.

65.      Spade did testify that Hamborsky had brought him snuff tobacco in the past.

66.     Spade, further testified that Hamborsky never brought him drugs and that he never asked Hamborsky to do such a thing.

67.     O'Barto testified to the process leading to the sting operation on November 5, 2008, as described in his Report.  Contained in that Report, as aforesaid, O'Barto stated he asked Spade if Hamborsky ever brought drugs into the prison and, according to O'Barto, Spade said yes.

68.     Spade's testimony at the Preliminary Hearing directly contradicts that Report. In fact, Spade claimed that he determined that Bugler tobacco, narcotic pills and $75.00 would be in the bag. Vernon specifically asked him who determined the price and the contents of the bag. O'Barto's Report contradicts this testimony as well.

69.     O'Barto was asked at the Preliminary Hearing if Spade testified in accordance with what he told him in those meetings, and he responded, "Yes".

70.     Magistrate Rubish held all charges over for trial.

71.     Between November 6, 2008 and April 1, 2009, Hamborsky filed a grievance through his Union with regard to the manner in which he was terminated from his employment with the County.

72.     As previously stated in this Complaint, Hamborsky was afforded the protections of a Collective Bargaining Agreement and was fired without the benefit of a pre-termination hearing as mandated by Federal and State law, commonly known as a *Loudermill* hearing.

73.     Eventually, a settlement was reached between Hamborsky and Fayette County. In exchange for Hamborsky voluntarily dropping his grievance and not pursing a legal claim against the County relative to the Procedural Due Process violation of his termination, he would be paid a sum for back pay, vacation time and sick leave. His employment status would be characterized as "laid off" but he is forbidden from being reinstated to his former position as a Correctional Officer or any other position with Fayette County. The Agreement took effect on April 1, 2009, and specifically exempts any cause of action that may accrue based on a favorable termination of his criminal charges.

74.     As more specifically described below, the favorable termination of Hamborsky's criminal charges on April 7, 2010, is the basis for this cause of action.

75.     Hamborsky, based on the widespread and inflammatory nature of the publicity surrounding his criminal charges, moved for a change of venue as well as recusal of Nancy Vernon as prosecutor because she was participant in the November 5, 2008 sting operation and, therefore, a potential witness in the case. Both Motions were denied.

76.     After jury selection, Hamborsky's trial began on April 5, 2010. The main witnesses for the prosecution were Erin Spade, Thomas O'Barto and Warden Larry Medlock.

77.     Spade testified that in exchange for his testimony, his retail theft charges would be dismissed by the Fayette County District Attorney. It is alleged that a deal was made with Spade prior to his testimony at trial.

78.     Spade's testimony mirrored his preliminary hearing testimony. He said that Hamborsky was his friend and that he had brought him snuff tobacco in the past, but had never brought him drugs.

79.     Spade testified to his meetings with Medlock and O'Barto, and his reasons for wanting to use his relationship with Hamborsky for his own benefit.

80.     Spade stated that he asked Hamborsky to bring him snuff and pills to him for which he would be paid Seventy Five ($75.00) Dollars.

81.     He was told by O'Barto exactly where the bag would be placed.

82.     O'Barto testified to the manner in which the sting operation was to be conducted.

83.     The idea was to have Hamborsky deliver a controlled substance, contraband, Vicodin pills, to Spade. Tobacco was irrelevant to the set up because it is not a crime to bring tobacco into the Fayette County Prison.

84.     In addition, O'Barto and Medlock knew that Hamborsky had been authorized by Medlock to provide snuff tobacco to Spade.

85.     Without the narcotics, there would be no set up and no criminal charges.

86.     O'Barto testified that Hamborsky was apprehended immediately upon entering the prison, on the landing in the stairwell.

87.     Hamborsky never opened the plastic bag.

88.     Plaintiff avers and therefore believes that O'Barto and Medlock and knew that Hamborsky was unaware of the Vicodin pills in that bag. Otherwise, they would have let the crime play out, which would have placed Hamborsky in a worse position had the delivery occurred. There would have been no way for Hamborsky to defend the criminal charges had he actually delivered the drugs to Spade.

89.     O'Barto was asked why he arrested Hamborsky and in the process, stopping the 'crime' from playing out.

90.     O'Barto testified that they did not want the drugs to make it into the general prison population.

91.     Medlock testified as well, giving the same excuse as O'Barto for arresting Hamborsky seconds after entry into the prison.

92.     Hamborsky testified that he considered Spade to be a friend, and that he trusted him more than some of his fellow guards.

93.     Plaintiff stated that he had never brought drugs into the prison, and never would have done such a thing.

94.     He admitted to providing snuff to Spade in the past, even after the prison became a tobacco free facility, and that he was authorized to do so by Warden Medlock himself.  Hamborsky stated that he personally saw Medlock give Spade snuff tobacco in the past.

95.     He testified that he never knew that narcotic pills were in the plastic bag.

96.     Hamborsky testified that had he seen what the bag contained, he would have immediately taken the pills to his Lieutenant.

97.     On April 7, 2010, the jury, after just two hours of deliberation, found Hamborsky not guilty on all charges.

## FIRST CAUSE OF ACTION

## MALCIOUS PROSECUTION & SEIZURE IN VIOLATION OF 42 USC §1983

### (AGAINST O'BARTO IN HIS INDIVIDUAL CAPACITY)

98.     Plaintiff incorporates by reference paragraphs 1 though 97 as though the same were here fully set forth at length.

99.     Defendant Thomas O'Barto is a "person" as that term is used in the text of 42 USC §1983.

100.    Under color of state law, O'Barto initiated and continued the criminal prosecution against the Plaintiff on charges of Possession of a Controlled

Substance with Intent to Deliver, Possession of a Controlled Substance; and, Possession of Contraband/Vicodin.

101.    There was no probable cause for the prosecution of the Plaintiff.

102.    Each of the three charges terminated in favor of the Plaintiff.

103.    O'Barto's actions were malicious and evidenced a reckless and callous disregard for, and deliberate indifference to, Plaintiff's constitutional rights.

104.    The basis for framing Hamborsky was the use of Erin Spade, whom Hamborsky considered a friend.

105.    O'Barto's Report specifically states that Spade told him that Hamborsky brought him drugs into the prison in the past.

106.    Spade never told O'Barto that Hamborsky smuggled drugs into the prison and testified under oath twice at a Preliminary Hearing and at Trial that not only did it not happen, but he had never asked Hamborsky to do such a thing.

107.    O'Barto also states in his Report that Medlock, after his first meeting with Spade, reported to him that Hamborsky was "smuggling tobacco and occasionally drugs into the prison." Further, Hamborsky was being paid for his efforts by Spade's mother.

108.    Plaintiff alleges that the Investigative Report, which formed the entire basis of the case, drafted by O'Barto, is false, fraudulent and designed to manufacture a case against Hamborsky based on a fiction.

109.    Spade never told Medlock that Hamborsky was "smuggling drugs" into the prison and the words attributed to Medlock are likewise false.

110.   As stated above, Medlock authorized Hamborsky to give Spade snuff, and was able to bring tobacco into designated areas of the prison without violating the tobacco free prison policy.

111.   O'Barto knew that drugs had to be basis for the case against Hamborsky, and, even though he had no reason to suspect Hamborsky of "smuggling drugs" into the prison, he devised a way to trick him by setting up a sting operation that would subject him to arrest, criminal prosecution, the loss of his job and benefits, public humiliation and ridicule.

112.   O'Barto, during the period of October 29 through November 5, 2008, had no problem with the use of Spade to set up Hamborsky even though he had no prior history with him as an informant and had no way of testing his veracity.

113.   He presented false information that Hamborsky had a history of smuggling drugs into the Fayette County Prison to the District Attorney to gain authorization to conduct the sting operation.

114.   That false information formed the alleged probable cause to conduct the operation against Hamborsky.

115.   O'Barto decided to frame Hamborsky because other such operations had failed in the past and he testified to that fact.

116.   On the night of November 5, 2008, Hamborsky was apprehended by O'Barto, Medlock, and Ryan Reese, and arrested within seconds of entering the Fayette County Prison.

117.   Hamborsky was then taken to Vernon's office where he was questioned by O'Barto.  He was called a liar and threatened that he would lose his pension if he did not confess.

118.   O'Barto took the unopened bag from Hamborsky and emptied the contents in front of Hamborsky.

119.   Hamborsky never knew drugs were in the bag.  He denied it from the outset, claimed he was framed, and defended his criminal charges on that very basis, which resulted in his acquittal on April 7, 2010.

120.   O'Barto, knew that Hamborsky was unaware that Vicodin pills and money were placed in the bag, and the manner in which he was arrested upon entering the prison is direct evidence that these Defendants did not want him to open that bag.

121.   As stated above, there was no probable cause to prosecute Hamborsky on drug charges. Indeed, O'Barto violated Pennsylvania law by using Spade as an informant because he had no history with Spade and was not aware of his reliability as an informant. O'Barto willfully and maliciously engaged in an illegal objective by various means with the intent to manufacture a case and maliciously prosecute the Plaintiff in some or all of the following particulars:

      a.    manufacturing a drug case against Hamborsky by fabricating evidence between October 29 and November 5, 2008 that Hamborsky was smuggling drugs into the Fayette County Prison;

      b.    placing false information the Investigative Report to reflect Hamborsky had a history of "smuggling" drugs into the Fayette County Prison in order to create probable cause to conduct a sting operation;

      c.    using that false Report as the basis for filing three criminal charges against Hamborsky; and

    d.    using a Report to maliciously prosecute Hamborsky on said drug charges;

    e.    using Erin Spade  in violation of the law because there was no historical reliability of Spade as an informant.

122.    As a result of the wrongful prosecution, Plaintiff was seized and deprived of his rights under the Fourth and Fourteenth Amendments to the United States Constitution.

123.    As a direct and foreseeable consequence of these deprivations, the Plaintiff has suffered economic loss, physical harm, emotional trauma, loss of liberty and irreparable harm to his reputation.

124.    As a further consequence of these deprivations, the Plaintiff was required to retain counsel to represent him in the criminal proceedings pursued against him and incurred expenses associated with defending against the unlawful criminal proceedings initiated and sustained by the defendants.

## SECOND CAUSE OF ACTION

## CONSPIRACY IN VIOLATION OF 42 USC §1983

### (Against O'Barto and Medlock in their individual capacities)

125.    Plaintiff incorporates by reference paragraphs 1 though 126 as though the same were here fully set forth at length.

126.    O'Barto and Medlock are "persons" as that term is used in the text of 42 USC § 1983.

127.    Under color of state law, O'Barto and Medlock entered into express and/or implied agreements, understandings, or meetings of the mind among

themselves to deprive the Plaintiff of his constitutional rights by charging and prosecuting an innocent man on three drug charges.

128.   On October 29, 2008, Medlock and O'Barto met to discuss Medlock's allegation that Hamborsky was 'smuggling drugs' into the prison, and had been "suspected of this activity for some time" according to Medock.

129.   Also on October 29, 2008, Spade was included in this meeting wherein an agreement between Spade, O'Barto and Medlock was made to set up Hamborsky into bringing drugs into the prison.

130.   Between October 29, 2008 and November 5, 2008, Spade, Medlock and O'Barto conspired manufacture a drug case against Hamborsky.

131.   During this same period time, O'Barto and Medlock agreed to create and/or fabricate probable cause by claiming that Spade told them Hamborsky had smuggled drugs into the prison in the past and that further, Medlock suspected Hamborsky of bringing drugs into the prison but could never catch him according to O'Barto's Report.

132.   This false information about Spade stating that Hamborsky had brought him drugs in the past was brought to then District Attorney, Nancy Vernon. When presented with this information, she approved O'Barto and the Fayette County Drug Task Force to conduct a "buy bust" or sting operation against Hamborsky.

133.   As stated above, Hamborsky was set up on November 5, 2008 wherein he was arrested and later charged by O'Barto with felony drug charges.

134.    Though Spade, O'Barto and Medlock conspired to frame Hamborsky, O'Barto and Medlock provided false evidence to the District Attorney in order to arrest, charge and prosecute the Plaintiff.

135.    O'Barto and Medlock both agreed to provide false evidence to the District Attorney in order to prosecute him on drug charges.

136.    Between April 4th and 6th, 2010, O'Barto met Medlock to discuss their testimony at Trial. In particular, not only would they coordinate their original "story" that there was probable cause to conduct a sting operation against Hamborsky, but also, to coordinate additional testimony.

137.    Anticipating that questions would be asked regarding why Hamborsky was arrested immediately after entering the prison on November 5, 2008, both O'Barto and Medlock agreed that both state they did not want the drugs to get into the prison population. This testimony would give them an excuse, they believed, to avoid the issue that Hamborsky was never told by Spade that drugs were placed in that bag. The coordination of false testimony was intended to deprive the Plaintiff of a fair trial in direct violation of his Fourteenth Amendment due process rights.

138.    Despite the fact that Aaron Spade's testimony directly contradicted both O'Barto's and Medlock's testimony regarding Hamborsky's past 'drug smuggling', Spade lied under oath that he asked Hamborsky to bring drugs into the prison for him on November 5, 2008 and both O'Barto and Medlock were aware of that fact. O'Barto knew when he met with both Spade and Medlock between April 4th and 6th, 2008 that false testimony would be elicited at trial.

139.   O'Barto and Medlock willfully participated in this illegal objective by various means with the intent to further the purpose of prosecuting him and attempting to violate Hamborsky's constitutional rights, including, for example:

a.   manufacturing a drug case against Hamborsky by conspiring to create false evidence against him between October 29 and November 5, 2008;

b.   falsifying the Investigative Report to reflect Hamborsky had a history of "smuggling" drugs into the Fayette County Prison;

c.   using that false Report as the basis for filing three criminal charges against Hamborsky when it was based on purely fabricated statements of both Medlock and O'Barto; and

d.   using a Report to prosecute Hamborsky on said drug charges and to conspire to coordinate false testimony to be elicited at trial;

e.   using Erin Spade in violation of the law because there was no historical reliability of Spade as an informant and further having Spade elicit false testimony at trial;

f.   Medlock falsely testifying at trial based on information that he and O'Barto falsely provided to the District Attorney.

140.   O'Barto and Medlock's actions evidenced a reckless and callous disregard for, and deliberate indifference to, Plaintiff's constitutional rights.

141.   As a direct and foreseeable consequence of this conspiracy, the Plaintiff was deprived of his rights under the Fourth and Fourteenth Amendments to the United States Constitution.

142.   As a direct and foreseeable consequence of these deprivations, the Plaintiff has suffered economic loss, physical harm, emotional trauma, loss of liberty and irreparable harm to his reputation.

143.   As a further consequence of these deprivations, the Plaintiff was required to retain counsel to represent him in the criminal proceedings pursued against him, and incurred expenses associated with defending against the unlawful criminal proceedings initiated and sustained by the defendants.

## THIRD CAUSE OF ACTION

## MALICIOUS PROSECUTION UNDER PENNSYLVANIA LAW

## (AGAINST O'BARTO, IN HIS INDIVIDUAL CAPACITY)

144.   Plaintiff incorporates by reference paragraphs 1 though 145 as though the same were here fully set forth at length.

145.   On November 6, 2008 O'Barto, initiated, and continued the criminal prosecution against the Plaintiff on charges of Possession of a Controlled Substance with Intent to Deliver, Possession of a Controlled Substance; and, Possession of Contraband/Vicodin up unto the Plaintiff's acquittal on April 7, 2010.

146.   There was no probable cause for the prosecution of the Plaintiff.

147.   On April 7, 2010, each of the three charges terminated in favor of the Plaintiff.

148.   O'Barto knew that drugs had to be basis for the case against Hamborsky, and, even though they had no reason to suspect Hamborsky of "smuggling drugs" into the prison, he devised a way to trick him by setting up a sting operation that would subject him to arrest, criminal prosecution, the loss of his job and benefits, public humiliation and ridicule.

149.   Indeed, O'Barto violated Pennsylvania law by using Spade as an informant because he had no history with Spade and was not aware of his reliability as an informant.

150.   O'Barto acted without probable cause demonstrated malice, ill-will, spite and wanton disregard for the Plaintiff's rights for as follows:

    a.   manufacturing a drug case against Hamborsky by fabricating false evidence between October 29 and November 5, 2008;

    b.   falsifying the Investigative Report to reflect Hamborsky had a history of "smuggling" drugs into the Fayette County Prison;

    c.   using that false Report as the basis for filing three criminal charges against Hamborsky;

    d.   using a false Report to prosecute Hamborsky on said drug charges; and

    e.   using Erin Spade  in violation of the law because there was no historical reliability of Spade as an informant;

    f.   framing Hamborsky by conducting a sting operation when there was no probable cause to do so.

151.   O'Barto  demonstrated malice, spite, ill-will and wanton disregard for the Plaintiff's rights by conspiring to manufacture and by manufacturing a false Report to create  Probable Cause upon which the entire case against Hamborsky was based, and with the knowledge that the Report would be used to advance and perpetuate the criminal process against Hamborsky.

152.   Hamborsky, after twenty two years of service to Fayette County, was publically humiliated in the media and branded a criminal. He was summarily fired less than a week after being framed by O'Barto.

153.    As a direct and foreseeable consequence of the Defendant O'Barto's conduct, Plaintiff was unreasonably and unlawfully subjected to criminal charges and prosecution.

154.    As a direct and foreseeable consequence of these acts, the Plaintiff has suffered economic loss, physical harm, emotional trauma, loss of liberty and irreparable harm to his reputation.

## PRAYER FOR RELIEF

WHEREFORE, to redress the injuries proximately and directly caused by the conduct of the Defendants stated in paragraphs 1 through 145, Plaintiff, Tim Hamborsky, hereby requests the following relief:

a.    Damages in an amount to be established at trial as compensation for constitutional deprivations; past and future economic losses, physical harm, emotional trauma, loss of privacy and loss of reputation, and expenses associated with defending against the criminal proceedings initiated and sustained by the Defendants' unlawful conduct;

b.    damages in an amount to be established at trial to punish Defendants for outrageous conduct pursued out of actual malice that recklessly and callously disregarded and was deliberately indifferent to the Plaintiff's constitutional rights, to deter them from engaging in similar conduct in the future, and to deter others similarly situated from engaging in similar conduct;

c.    An award of attorney's fees, including attorney's fees pursuant to 42 USC § 1988 (b);

d.    whatever further and additional relief as this court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby requests a trial by jury on all claims triable.

Dated:  November 16, 2012

Respectfully submitted,

MOORE BECKER SMARTO
  & CISZEK, P.C.

BY:   /S/  JOHN P. SMARTO
     John P. Smarto, Esquire
     P.A. ID#58293
     Email: john@moorebecker.com

Attorneys for Plaintiff
121 West Second Street
Greensburg, Pa. 15601
724-838-8422
FAX: 724-837-1983

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the

foregoing document has been forwarded to all counsel of record by:

_____          U.S. First Class Mail, Postage paid

_____          Hand Delivery

_____          Certified Mail, Return Receipt Requested

_____          Facsimile Transmittal

_____          UPS Delivery

\_\_\_x\_\_          Electronic Filing/Service

at the following address:

Marie Milie Jones, Esq.
Jones Passodelis, PLLC
707 Grant Street, Suite 3510
Pittsburgh, PA  15219
mjones@jonespassodelis.com

MOORE BECKER SMARTO & CISZEK, P.C.

Date:  November 16, 2012

/s/  John P. Smarto
JOHN P. SMARTO, ESQ.
PA I.D.   58293
Attorney for Plaintiff

122 West Second Street
Greensburg, PA  15601

724-838-8422
724-838-0921- fax