# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TIM HAMBORSKY, | ) |
|         Plaintiff, | ) |
| v. | ) 2:12-cv-428 |
| THOMAS O'BARTO and LARRY MEDLOCK, | ) |
|         Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 34), filed by Thomas O'Barto and Larry Medlock ("Defendants"). Defendants also filed a brief and concise statement of material facts ("CSMF") in support of their motion. (ECF Nos. 35, 36). Tim Hamborsky ("Plaintiff") filed a BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 44) and a separate response to Defendants' CSMF (ECF No. 45). The motion is ripe for disposition. For the following reasons, the motion will be **GRANTED**.

### I. Background

This Section 1983 action arises out of a sting operation targeted at Plaintiff, a long-time correctional officer at the Fayette County Prison, as executed by the Fayette County Drug Task Force, of which Defendant O'Barto is a member, in conjunction with the prison's warden, Defendant Medlock, and a jailhouse informant. Plaintiff was apprehended while attempting to bring a bag containing tobacco and four Vicodin pills into the prison for the informant. As a

1

result of the operation, Plaintiff was charged with three drug-related offenses. Ultimately, however, he was acquitted of all of the charges. He now claims that the prosecution violated his Fourth Amendment rights since it was allegedly not based on probable cause. He also claims that the Defendants engaged in a conspiracy to deprive him of his rights.

### A. Factual Background

Plaintiff was a correctional officer at the prison from December 6, 1987, until November 12, 2008. During that time, he became friendly with an inmate named Erin Spade, a career criminal and one of the prison's "frequent flyers." Spade was considered a "trusty," or inmate worker, so he was permitted to spend time outside of the general population unit working on various projects (*e.g.*, painting or cleaning) in other parts of the prison. While Spade was working outside the general population unit, Plaintiff admitted that he would sometimes provide him with "snuff" tobacco. He continued to do so even after the prison adopted a tobacco-free policy for inmates. Although Plaintiff knew that providing Spade with tobacco was technically in violation of the prison's revised policy, it does not appear that he thought twice about continuing to do it. "Everyone else was giving snuff. No one seemed to care," he testified. Pl.'s Dep. at 53:23-24. "I was just doing what everyone else was doing." Plaintiff, however, vehemently denied ever having given Spade illicit drugs.

In September 2008, Spade, who was then serving time on a parole violation and awaiting the disposition of a retail theft charge, sent Medlock at least three request slips seeking a meeting to discuss a then-unnamed correctional officer, who turned out to be Plaintiff. Medlock considered Spade a "snitch" who would keep tabs on inmates and correctional officers for the prison's top brass. After receiving the requests, Medlock eventually agreed to meet with Spade. During their meeting, Spade told Medlock that Plaintiff was bringing "contraband" into the

prison, including tobacco, pills, and marijuana. Plaintiff disputes that Spade ever told Medlock that Plaintiff had brought drugs into the prison for him. According to Medlock, however, he had suspected that Plaintiff had been engaging in such conduct for some time, but his hunch was apparently based on nothing more than prison rumors.

After meeting with Spade, Medlock reached out to Defendant O'Barto, a detective with the Fayette County Drug Task Force. The two met to discuss Plaintiff's potential involvement in smuggling drugs into the prison on October 29, 2008. Later that day, Medlock and O'Barto met with Spade. During this meeting—the first of three between O'Barto and Spade leading up to the sting—Spade told O'Barto that in exchange for his assistance in getting his retail theft charge dismissed or reduced, he could get Plaintiff to bring narcotic pills and tobacco into the prison. O'Barto was not concerned with the allegation regarding tobacco, but the suggestion that Plaintiff had been bringing drugs into the prison piqued his concern. Eventually, it was agreed that Spade would ask Plaintiff to bring him a shopping bag containing tobacco and Vicodin pills in exchange for $75.00 in cash. According to O'Barto's testimony, it was Spade's idea to put the pills in the bag, while O'Barto proposed having the money put inside. Soon thereafter, Spade met with Plaintiff to see whether he would be amenable to the deal. Although Plaintiff admitted that he agreed to bring tobacco into the prison for Spade, he denied that Spade said anything about Vicodin during their discussion.

On November 3, after having received approval to proceed with the sting from then-Fayette County District Attorney ("DA") Nancy Vernon, O'Barto met with Spade again to finalize the plan. After Spade confirmed that "everything was good," the two fleshed out the details of the sting. O'Barto instructed Spade to tell Plaintiff that the package would be left in a newspaper vending machine near the County courthouse, which is adjacent to the prison.

3

Plaintiff was to pick up the shopping bag before starting his midnight shift on November 5 and then bring it into the prison, where he would be apprehended. O'Barto and Spade met for the final time on November 4 and confirmed that Plaintiff would be picking up the package the next night, as planned.

At approximately 11:30 on the night of the sting, Plaintiff arrived at the courthouse, retrieved the bag from under the newspaper vending machine, placed it inside the upper part of his jacket, and headed into the prison. Meanwhile, Medlock, O'Barto, and Deputy Warden Miller were stationed outside the back entrance of the courthouse and watched as Plaintiff's truck pulled up. Upon observing Plaintiff head toward the prison, Medlock and O'Barto followed him, and once inside Medlock called out for Plaintiff to stop. Medlock, O'Barto, and other members of the Drug Task Force then escorted Plaintiff, who was never placed in handcuffs, from the prison to the adjacent courthouse, where the DA's office was located. While walking to the courthouse, O'Barto attempted to Mirandize Plaintiff. At the time, Plaintiff apparently did not understand the nature of his rights. Once inside the DA's office, however, Plaintiff signed a waiver of rights form and agreed to speak with law enforcement. Ultimately, a search of Plaintiff's jacket uncovered the bag, which by then had slid down into the jacket's sleeve. One of the police officers opened the bag in Plaintiff's presence and revealed that it contained a package of Bugler tobacco with four Vicodin pills secreted inside, along with $75.00. After seeing the drugs, Plaintiff was confounded, as he claimed that the bag was only supposed to have contained tobacco. Sometime soon after the pills were discovered, Medlock advised Plaintiff that he would be placed on indefinite suspension.

Plaintiff was then transported to the nearby police station for a video arraignment. He was charged by O'Barto with possession of a controlled substance, possession with intent to

deliver a controlled substance, and furnishing a controlled substance to a confined person. While in the police station, Plaintiff asked Detective Ryan Reese, a member of the drug task force, whether he could be released that night without paying bond. Reese said that he would see what he could do. Later, O'Barto asked Plaintiff to provide a written statement regarding the incident. Plaintiff obliged and wrote the following paragraph:

> I, Tim Hamborsky, did pick up a bag of tobacco to take to the prison to Inmate Spade. I did not know anything about drugs. I only did it because I needed money to live on. I only thought it had tobacco in it. I knew Spade for awhile and was also just helping him out.

Def.'s CSMF, Ex. E (ECF No. 36).

Plaintiff was released pending trial on $25,000 unsecured bond. No travel restrictions were imposed. In fact, just a few days after the sting, Plaintiff embarked on a previously scheduled nine-day hunting trip to Illinois.

Plaintiff received a memorandum confirming his indefinite suspension on November 7, 2008. Five days later, the Prison Board voted to terminate his employment—a decision which Plaintiff claimed was made without having afforded him due process. In early 2009, in exchange for a settlement of his due process claim, Plaintiff signed a Settlement Agreement, by which he released all claims against the County, with the following exception:

> 11. It is specifically understood and intended that depending on the final disposition of Hamborksy's criminal charges, that Hamborsky may have various causes of action for violation of his civil rights as well as other claims which are civil in nature as a result of allegedly entrapping him into bringing drugs, tobacco or other items in the Fayette County prison on November 5, 2008, and therefore, this agreement does not extinguish, release or discharge any individual who may be responsible for the alleged entrapment and Hamborsky's ability to pursue civil causes of action against such individuals of any character, kind or nature, even though some of those individuals may be employed by the County.

Def.'s CSMF, Ex. I at 6 (ECF No. 36).

Plaintiff went to trial on the charges on April 6, 2010, apparently raising the defense of entrapment. A jury acquitted him the next day.

### B. Procedural History

Plaintiff initiated this action on April 3, 2012, by filing a Complaint against the current two Defendants, along with Fayette County and DA Vernon. (ECF No. 1). The Complaint raised five causes of action: § 1983 claims for malicious prosecution, "fabrication of false evidence," and conspiracy and state-law claims for malicious prosecution against Vernon, Medlock, and O'Barto and a corresponding *Monell* claim against Fayette County. On September 4, 2012, Defendants moved to dismiss. (ECF No. 10). In lieu of responding to Defendants' motion to dismiss, Plaintiff agreed to voluntarily withdraw his claim for "fabrication of false evidence" and dismiss his claims against Vernon and the County. (ECF No. 14). On November 16, 2012, Plaintiff filed an Amended Complaint, alleging three causes of action: (1) a § 1983 malicious prosecution claim against O'Barto; (2) a § 1983 conspiracy claim against Medlock and O'Barto, and (3) a state-law malicious prosecution claim against O'Barto. Defendants filed an Answer on December 6, 2012, denying the material allegations in the Amended Complaint. (ECF No. 19). This motion for summary judgment followed after the close of discovery.

## II. Standard of Review

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, the Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1986). The nonmoving party must raise "more than a mere scintilla of

evidence in its favor" in order to overcome a summary judgment motion. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (citing *Liberty Lobby*, 477 U.S. at 249). Further, the nonmoving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Distilled to its essence, the summary judgment standard requires the nonmoving party to create a "sufficient disagreement to require submission [of the evidence] to a jury." *Liberty Lobby*, 477 U.S. at 251-52.

## III. Discussion

As an initial matter, the Court must quickly dispose of Defendants' contention that Plaintiff's claims are outside the scope of the exception to the Settlement Agreement because they do not "relate to alleged entrapment . . . ." Def.'s Br. in Supp. of Mot. for Summ. J. at 19 (ECF No. 35). First of all, as Plaintiff points out, the Agreement does not limit him to bringing a cause of action for "entrapment." Adopting that interpretation would rob the exception of all meaning since entrapment is not actionable in and of itself under § 1983. *Jones v. Bombeck*, 375 F.2d 737, 738 (3d Cir. 1967) ("While entrapment may be a proper defense in a criminal action, a police officer's participation in such activity does not constitute a constitutional violation."). Rather, the Settlement Agreement makes clear that Plaintiff "may have ***various causes of action for violation of his civil rights***" and that the "Agreement does not extinguish, release or discharge any individual who may be responsible for the alleged entrapment and [Plaintiff's] ability to pursue ***civil causes of action*** against such individual ***of any character, kind or nature*** . . ." The parties decision to specify that such claims may arise "depending on the final disposition of [Plaintiff's] criminal charges" further undermines Defendants' argument, as it suggests that they were contemplating that Plaintiff might have a claim for malicious prosecution—a claim

7

that would only be viable if the criminal proceedings ended favorably for Plaintiff.

Moreover, a fair reading of the Agreement suggests that the phrase "alleged entrapment" was used to describe the sting operation and not in the technical, legal sense that Defendants urge the Court to adopt. From Plaintiff's perspective, the sting constituted entrapment, or more colloquially, a "set up"—it was a "method of persuasion or inducement" that created a "substantial risk" that he would commit a crime that he was otherwise not disposed to commit. Both of Plaintiff's claims arose "as a result of" the sting (the "alleged entrapment"). Thus, they are not barred by the Settlement Agreement.

On to the merits. The elements of a claim for malicious prosecution under § 1983 and Pennsylvania law largely overlap. In order to establish either claim, a plaintiff must show that:

> (1) the defendant[] initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; [and] (4) the defendant[] acted maliciously or for a purpose other than bringing the plaintiff to justice.

*McKenna v. City of Philadelphia*, 582 F.3d 447, 461 (3d Cir. 2009) (citation omitted). Section 1983 requires the plaintiff to "show some deprivation of liberty consistent with the concept of seizure" in addition to the four elements of the common law tort. *Johnson v. Knorr*, 477 F.3d 75, 85 n.14 (3d Cir. 2007). The first and second elements are not in dispute here, nor could they be. O'Barto filed the criminal complaint against Plaintiff, and the criminal case ended in an acquittal. Defendants do, however, contest each of the remaining elements. They also argue that they are entitled to qualified immunity.

Lack of probable cause is the "*sine qua non*" of a successful malicious prosecution claim, *Trabal v. Wells Fargo Armored Services Corp.*, 269 F.3d 243, 249 (3d Cir. 2001), so that is where our discussion begins and where it will end if probable cause was present. A person has probable cause to initiate criminal proceedings if the "facts and circumstances within [his]

knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the plaintiff." *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 788 (3d Cir. 2000) (citation and quotation marks omitted). This standard is much lower than that which is required to sustain a conviction, as there must only be a "'fair probability'" that the defendant committed the crime(s) charged. *Wright v. City of Philadelphia*, 409 F.3d 595, 602 (3d Cir. 2005) (quoting *Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2000)). A defendant's subsequent acquittal on the charge(s) is thus immaterial to the question of whether the officer had probable cause to bring the charge(s) in the first place. *Id.* (citing *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979)). Generally, it should be left to a jury to decide whether probable cause existed. *Id.* (citation omitted). A court may, however, decide the question as a matter of law and, in turn, grant summary judgment to a defendant "if the evidence, viewed most favorably to Plaintiff, reasonably would not support a contrary factual finding . . . ." *Id.* (citation omitted).

Viewing the circumstances from the perspective of an objectively reasonable officer, the Court cannot but conclude that there was probable cause for Plaintiff's prosecution. At the time Plaintiff was charged, O'Barto knew that Plaintiff had discussed bringing some type of contraband into the prison for Spade (more on this *infra*); he knew that Plaintiff retrieved a bag from under the newspaper vending machine and brought it into the prison; and he discovered that the bag contained Vicodin, which is a controlled substance under Pennsylvania law. All together, these facts gave O'Barto an ample basis to charge Plaintiff with possession of Vicodin, possession with intent to deliver Vicodin, and furnishing Vicodin to a prisoner. Furthermore, the fact that the charges arose out of a sting operation does not negate the existence of probable cause. *See Crane v. Sussex Cnty. Prosecutor's Office*, Civ. No. 08-1641 SDW/E, 2009 WL 192567, at *5 (D.N.J. Jan. 27, 2009) ("[W]hen police obtain white powder, or rock-like

substances in a sting-like situation, there will always be probable cause to arrest."); *see also Garcia v. City of Chicago*, 24 F.3d 966, 970 (7th Cir. 1994) ("Garcia concedes that finding a white powder in a person's possession provides probable cause to arrest that person for possession of cocaine."). It is also irrelevant for the purposes of determining whether probable cause existed *at the time that the charges were initiated* that Plaintiff may have successfully raised the defense of entrapment at his criminal trial. *See Humphrey v. Staszak*, 148 F.3d 719, 724 (7th Cir. 1998) ("[E]ven if Humphrey had successfully asserted the defense of entrapment during his criminal prosecution, probable cause to arrest is not necessarily negated by a defendant's successful assertion at trial of an entrapment defense."); *Jackson v. Capraun*, Civ. No. 09- 1737, 2011 WL 4344589, at *4 (M.D. Fla. Sept. 15, 2011) *aff'd*, 534 F. App'x 854 (11th Cir. 2013) ("Additionally, a claim of entrapment is not sufficient to support section 1983 liability or to negate probable cause.").

Plaintiff attempts to create a genuine issue of material fact on the probable-cause issue by making two independent but related arguments. First, relying on Spade's testimony at the preliminary hearing and trial, which contradicted what he apparently told O'Barto and Medlock during their pre-sting meetings, Plaintiff contends that there is a factual dispute as to whether he ever brought drugs into the prison before November 5. Plaintiff argues that if Spade never told O'Barto or Medlock that Plaintiff had brought drugs into the prison, then there was no basis for Defendants to initiate the sting operation or to bring the charges against him.

The problem with this argument is that it assumes that Defendants needed probable cause to believe that Plaintiff had engaged in wrongdoing before launching the sting operation. Not so. It is well settled that officers do not need any degree of individualized suspicion of wrongdoing in order to launch an undercover investigation or a sting operation against an individual. *See*

*United States v. Jannotti*, 673 F.2d 578, 609 (3d Cir. 1982) (internal quotation marks omitted) ("[I]t is inconsequential whether law enforcement officials did or did not act on well-grounded suspicion that the defendant was engaging in wrongdoing, or whether they had probable cause for approaching the defendant."); *United States v. Hollingsworth*, 9 F.3d 593, 596-97 (7th Cir. 1993) *on reh'g*, 27 F.3d 1196 (7th Cir. 1994) ("The government is no more required to establish probable cause, or even a lesser degree of cause such as reasonable suspicion, before launching a sting operation than it is required to establish probable cause or reasonable suspicion in order to employ an undercover agent . . . ."); *United States v. Gamble*, 737 F.2d 853 (10th Cir. 1984) ("We have held that the government need not have a reasonable suspicion of wrongdoing in order to conduct an undercover investigation of a particular person."). Often times, the purpose of a sting operation is to gather information about a person about whom the government *lacks* sufficient evidence to prosecute. In other words, stings are used to develop probable cause that a person has been committing crimes, so that he may later be charged. Bruce Hay, *Sting Operations, Undercover Agents, and Entrapment*, 70 Mo. L. Rev. 387, 393 (2005). It would make little sense, then, to require the government to have enough evidence to prosecute a crime before engaging in a sting. Why would it need to go through the hassle of putting on a potentially risky, elaborate scheme if it could already go forward with the prosecution?

Second, Plaintiff contends that probable cause is negated by his claim that he believed he was only bringing tobacco into the prison and that he lacked knowledge of the presence of the drugs in the bag. The Ninth Circuit Court of Appeals, however, rejected a similar argument in *Garcia v. County of Merced*, 639 F.3d 1206, 1211 (9th Cir. 2011). *Garcia* arose out of a sting operation involving an informant who told law enforcement that Garcia, an attorney, was bringing methamphetamine into the prison for one of his clients. *Id.* at 1209. As part of the sting,

law enforcement officials gave the informant a Bugler tobacco pouch containing methamphetamine, which was clearly visible inside the pouch, for delivery to the client via Garcia. *Id.* at 1210. The officers then witnessed Garcia accept the pouch from the informant and take it to his law office, which police later searched pursuant to a warrant. *Id.* He was arrested after the search. *Id.* Garcia sued, alleging that he was arrested without probable cause, and the district court held that there was a disputed fact issue as to whether he knew there was methamphetamine in the bag, which precluded the court from finding that probable cause existed as a matter of law. *Id.* at 1208.

> The Ninth Circuit Court of Appeals disagreed:
>
> The mistake made by the district court in its analysis of probable cause was to use Garcia's *subsequent* self-serving denial that he *knowingly* accepted methamphetamine in the pouch as a reason, in a qualified immunity context, to conclude that probable cause *at the time of Garcia's arrest* was a disputed factual issue. For a trial on charges of knowing possession, Garcia might disclaim knowledge of the contents of the pouch, but that is a different issue from what the arresting officers had probable cause to believe when he was taken into custody. Probable cause cannot be defeated by a defendant's subsequent denial in court that he had the knowledge or the intent required for a conviction.

*Id.* at 1211 (emphasis in original).

The same is true here. Even though Plaintiff now denies knowledge of the contents of the bag, the fact remains that at the time he was apprehended, drugs were present. That gave O'Barto a sufficient factual predicate to initiate the charges. He need not have anticipated any defenses that Plaintiff could have raised at trial on the criminal charges.

Accordingly, because O'Barto had probable cause to bring the charges against Plaintiff, both his Fourth Amendment and his state-law malicious prosecution claims must fail.[1] Inasmuch

---

[1] Alternatively, because there was no violation of Plaintiff's constitutional rights, Defendants are entitled to qualified immunity for their actions. *Williams v. Bitner*, 285 F. Supp. 2d 593, 603 (M.D. Pa. 2003) (explaining that defendant is entitled to qualified immunity upon showing "either that no violation actually occurred or that the right was not clearly established at the time of the alleged violation").

as Plaintiff has not established a violation of his Fourth Amendment rights, Defendants are also entitled to summary judgment on the § 1983 conspiracy claim.² *See White v. Brown*, 408 F. App'x 595, 599 (3d Cir. 2010) ("[T]he District Court properly granted summary judgment on [plaintiff's] conspiracy claims because [he] cannot establish an underlying violation of his constitutional rights.").

## IV. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment will be granted in its entirety. An appropriate Order follows.

McVerry, J.

---

² In any event, there is no evidence of any agreement between Medlock and O'Barto to arrest Plaintiff and have him prosecuted, so even if Plaintiff had made out a Fourth Amendment violation, his conspiracy claim would still be without merit.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TIM HAMBORSKY,<br>   Plaintiff,<br><br>   v.<br><br>THOMAS O'BARTO and<br>LARRY MEDLOCK,<br>   Defendants. | )<br>)<br>)<br>) 2:12-cv-428<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## ORDER OF COURT

**AND NOW**, this 9th day of May, 2014, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED** and **DECREED** that DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 34) is **GRANTED** in its entirety. The Clerk shall docket this case as closed.

                BY THE COURT:

                s/Terrence F. McVerry
                United States District Judge

cc:  **John P. Smarto**
    Email: john@moorebecker.com

    **Marie Milie Jones**
    Email: mjones@jonespassodelis.com